IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOANNE L.[1],

      **Plaintiff,**

  v.

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

Civil Action 2:22-cv-2051
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Plaintiff, Joanne L., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the Court for on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 8). For the reasons that follow, the Court **REVERSES** the Commissioner of Social Security's nondisability finding and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff protectively filed her application for benefits on September 25, 2020, alleging that she has been disabled since September 11, 2020, due to psoriatic arthritis, Hashimoto's disease, ankylosing spondylitis, severe degenerative disc disease, disc herniations, severe disc space narrowing, dextroscoliosis, severe pain all over body, nerve damage on left side and

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

osteoarthritis. (R. at 203-209, 239.) Plaintiff's application was denied initially in February 2021 and upon reconsideration in July 2021. (R. at 75-101.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 135-136.) Administrative law judge Deborah Sanders (the "ALJ") held a telephone hearing on November 1, 2021, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 37-74.) A vocational expert ("VE") also appeared and testified. (*Id.*) On December 10, 2021, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 12-36.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.)

## II.    RELEVANT RECORD EVIDENCE

### A.  Relevant Hearing Testimony

The ALJ summarized Plaintiff's relevant statements to the agency and hearing testimony:

> The record shows, or [Plaintiff] testified at the hearing that she has problems with lifting, squatting, bending, standing, reaching, walking, kneeling, sitting, climbing stairs, seeing, memory, completing tasks and concentrating. She testified that she has nerve and spine damage on the left side of her body because she waited too long to have her first spinal surgery. She also testified that she had difficulty putting on pants, could not get out of the tub and sometimes had problems getting off of the toilet, did not leave the house much and had brain fog. She also indicated her anxiety made her condition worse. She also indicated she had three autoimmune diseases, extreme tiredness, her joints swell, and she could not move and claimed she could walk 30 steps before she had to stop and rest 3 to 5 minutes before she could resume walking. According to her she mostly lay in bed all day, as that was how she had the least amount of pain because sitting in chairs was painful. She further noted she could not sit in a chair more than 30 minutes as her back, legs and arms became numb. [Plaintiff] also reported she had already had spinal surgery due to severe disc disease and her doctor wanted her to do spinal cord stimulation due to chronic pain. She also indicated she had undergone total knee replacement. [Plaintiff] also related Hashimoto's disease, psoriatic arthritis and ankylosing spondylitis caused extreme fatigue and she usually got two- or three-hours sleep. Additionally, [Plaintiff] testified she had been taking Morphine since 2015 or 2016, but her doctor had just placed her on Methadone approximately 45 days prior to the hearing because her Morphine was no longer working since she had been on it for

> so long. According to her, while Methadone helped with her pain [but] it made her extremely tired.

(R. at 22 (internal citations omitted).)

### B. Relevant Medical Records

The ALJ summarized the relevant medical records as to Plaintiff's physical impairments as follows:

> [Plaintiff's] medical history is significant for chronic bilateral low back pain with left-sided sciatica, and she is status post remote L3-4, L4-5 lumbar laminectomy in 2015. The evidentiary record also documents her treatment for several conditions, including post laminectomy syndrome; ankylosing spondylosis and disc herniation of the lumbar and cervical spine; bilateral sacroiliitis; generalized and psoriatic arthritis and rheumatoid arthritis. She has endorsed back and joint pain, joint swelling and muscle weakness. In addition to surgical correction, [Plaintiff] has treated her symptoms with injections, ablation, nerve blocks, chiropractic adjustment, physical therapy, transcutaneous nerve stimulation, home exercises and stretching. Imaging performed shortly before [Plaintiff's] alleged onset date revealed mild symmetric bilateral sacroiliitis, moderate lumbar spondylosis and severe degenerative disc disease towards the right at L5-S1. January 26, 2021 imaging demonstrated dextroscoliosis and multilevel degenerative disc disease and facet arthrosis. There was no pathologic motion with flexion and extension noted.
> \*\*\*
>
> The evidentiary record does document [Plaintiff's] longstanding low back pain and musculoskeletal discomfort. While there have been subjective findings on examination such as limitations of motion due to pain, or pain on palpation on occasion, there is no evidence of persistent neurological deficits or signs of nerve root compromise. For instance, examination on September 29, 2020 found no musculoskeletal joint swelling or edema. Neurologic examination was grossly intact with normal motor and neurologic sensation. [Plaintiff] reported aching, cramping, shooting and stabbing pain across the low back, more on the left side than the right, with radiation to the left and right knees and feet during a January 26, 2021 spine consultation. She claimed the pain worsened with bending, sitting, standing and twisting. She denied saddle anesthesia, lower extremity weakness, bowel or bladder dysfunction or gait instability. While there was mild diffuse tenderness to palpation of the lumbar paraspinal muscles in the low back there was no tenderness over either trochanteric bursa or tenderness over palpation of the spinous processes. Range of motion of the low back was not assessed due to pain. Manual muscle testing in the bilateral lower extremities was normal and sensation to light touch was normal over the bilateral lower extremities. Straight leg raising while seated was normal. She was referred for possible spinal cord stimulator and

referred to water therapy and possible transition to land therapy as indicated. While [Plaintiff] reported continued pain in her lower back, mostly along the spinal axis rating transversely into her hips and aching in her legs on February 15, 2021, she denied any radicular symptoms. Additionally, she related her chronic nerve pain in the left leg was somewhat suppressed by her Gabapentin and denied any weakness or paresthesias in her lower extremities. She also denied decreased range of motion, muscle weakness, myalgia and any cauda equina symptoms and rated her pain a 0 on a 10-point numeric pain scale. Examination found bilateral sacroiliac joint tenderness with positive Patrick Faber's testing. Straight leg raise testing in the supine and seated positions was negative bilaterally. Various options were discussed, including spinal cord stimulator and sacroiliac joint injections. As [Plaintiff] was not highly motivated for spinal cord stimulation, she was scheduled for sacroiliac joint injections. February 17, 2021 notes document [Plaintiff's] report of lumbar spine pain without radiation over the legs. She did related [sic] numbness, paresthesias, tingling and weakness in her legs and claimed her overall quality of life had been severely affected by her worsened back pain symptoms and that even short periods of standing or walking markedly exacerbated her symptoms. She was neurologically intact, and her muscle bulk and tone were normal, and strength was normal throughout her upper and lower extremities bilaterally. Sensation was normal to proprioception and light touch. Her gait was antalgic with flexed lumbar posture. Her reflexes were 2+ throughout her upper and lower extremities and there were no pathologic responses, including absent Hoffman's, Babinski and no ankle clonus. Lumbar lordosis was maintained with no obvious deformity. Lumbar range of motion was reduced in both flexion and extension, causing low back pain. Straight leg raise was negative bilaterally. Range of motion in her hips was painless and complete. Her doctor reviewed previous imaging, noting multilevel degenerative changes but without significant stenosis, and opined no surgical intervention appeared warranted. Moreover, he noted that given her ongoing symptoms continued conservative management, including physical therapy, had the greatest likelihood of providing symptomatic relief over the long-term. Her doctor also noted she may benefit from consultation with a pain management specialist and also discussed spinal cord stimulation versus a pain pump and advised her to continue with her daily physical activities as tolerated and continue performing her usual activities of daily living and to avoid prolonged rest as a means for pain control. While she described her pain as 8 out of 10 on a numeric pain scale on April 8, 2021, she denied back pain, decreased range of motion, muscle weakness, paresthesias, trouble walking and myalgia. Her gait was antalgic. Lumbar flexion was 45 degrees flexion and 5 degrees extension, and 15 degrees lateral flexion left and right. Facet loading was positive on the left. Straight leg raising in both the seated and supine positions were negative bilaterally. April 8, 2021 notes show [Plaintiff] cancelled her sacroiliac joint injection appointment because she would not be able to remain awake during the procedure and because they had never worked in the past and would not work just because it was a different doctor. She did report her medication brought her pain down to a 6 out of 10 on average for 4-5 hours. The evidence also fails to show that [Plaintiff] has consistently exhibited

most of the signs typically associated with chronic, severe pain, such as muscle atrophy, spasm, rigidity, or tremor and [Plaintiff] has denied bowel or bladder incontinence.

The record also documents [Plaintiff's] osteoarthritis of right knee, and she is post left knee arthroplasty. Subsequent imaging has revealed intact left knee arthroplasty and mild to moderate osteoarthritis in the right knee medial compartment with small joint effusion. Examination on September 29, 2020 found no joint swelling or edema. Neurologic examination was grossly intact with normal motor and neurologic sensation and her balance and gait was normal as well. She denied any gait instability on January 26, 2021. Range of motion, manual muscle testing and sensation to light touch in the lower extremities was normal bilaterally. [Plaintiff] reported increased bilateral knee pain and requested a referral to orthopedics for her pain on May 5, 2021. However, she also noted she had gained a significant amount of weight in the last six months and believed it had contributed to her knee pain. Her gait was antalgic and there was loss of terminal extension and both active and passive range of motion were decreased. There was also effusion and quad atrophy and weakness, varus deformity and varus pseudolaxity, medial joint line tenderness and crepitus appreciated. There was tenderness and mild decreased range of motion in her left knee and swelling, tenderness and moderately decreased range of motion in the right knee. Imaging of the right knee revealed moderate osteoarthritis of the right knee joint. Imaging of her left knee revealed anatomic alignment of the left knee joint arthroplasty without complication or evidence of loosening, failure or periprosthetic fracture, or evidence knee joint effusion. [Plaintiff] elected to proceed with elective total right knee replacement.

With respect to her autoimmune conditions, October 2020 workup showed negative rheumatoid factor. Regarding her psoriatic arthritis, she endorsed diffuse pain and a history of ankylosing spondylitis and psoriatic arthritis during a January 21, 2021 rheumatology consultation. She was in no acute distress. Examination found no periungual telangectasia, no scleroderma skin changes, no evidence of vasculitis, no rashes, petechiae or sub-cutaneous nodules. While there were multiple tender points all over her back, there was no edema in her extremities or synovitis in any of her joints. She was assessed with psoriatic arthritis and polyarthralgia and restarted on Humira given her previous good response in achieving and maintaining control of inflammation and underlying disease process on the medication. Subsequent notes show her denial of symptoms after starting Humira. For instance, she denied joint pain, joint swelling, and muscle weakness on April 30, 2021. Additionally, examinations have failed to find evidence of inflammation, rash or other abnormality. [Plaintiff] was switched to Otezla on July 21, 2021 due to recurrent infections on Humira. However, October 6, 2021 notes indicate she had yet to start the medication due to insurance issues. Examination found tenderness and swelling in her ankles, some metacarpophalangeal swelling, tenderness in her knees, some tender points in her back and painful shoulder movements.

> I have also taken into account the amplifying effects of [Plaintiff's] obesity on her other severe impairments at all steps of the evaluation process. She was placed on Adipex after her BMI was noted as 37.67 on May 5, 2021. June 23, 2021 notes show [Plaintiff] was requesting a refill of her Adipex as well as a referral to an endocrinologist and a dietician for her thyroid and weight management. Her weight was noted as 195.8 pounds, which equated to a BMI of 37. Her BMI was noted as 36.84 on August 10, 2021 and 36.66 on September 22, 2021. At the hearing, [Plaintiff] testified she was 5'1" tall and weighed 198 pounds.

(R. at 22-25 (internal citations omitted).) The ALJ summarized the relevant medical records as to Plaintiff's mental health impairments as follows:

> In addition to her musculoskeletal impairments, the evidentiary record also documents [Plaintiff's] depression and reports of depressed mood, mood swings, anxiety, difficulty concentrating, inability to focus, inappropriate interaction, feeling hopeless, insomnia, obsessiveness, excessive worry, forgetfulness, crying spells, anhedonia, fatigue and irritability. She has presented with depressed and tearful affect and has also endorsed occasional suicidal ideation, feelings of apathy to the extent that she remained in bed throughout the day and worsening depression during the winter months. [Plaintiff] attended a consultative psychological evaluation on January 19, 2021 reporting she generally felt depressed. She related her depression worsened during the winter months and her mood was better when she was in Florida. She also endorsed anhedonia, problems with frustration, memory, concentration, irritability, feeling trapped, crying spells and seeing daily events in a negative manner. She indicated she was taking Trazadone and Amitriptyline for sleep and had made suicidal attempts in 2014 and 2015 by trying to overdose on her medication. She also endorsed ongoing occasional suicidal thoughts. She was casually groomed. While she did not exhibit any tics or unusual mannerisms or movements she did exhibit postural shifts to ease pain during the evaluation. She was able to make and maintain eye contact during the evaluation. Her speech was understandable and moderate in volume and speed. She was pleasant and cooperative, was able to initiate conversation and exhibited a full range of inflections during the evaluation. Her articulation was clear, and she did not have any apparent difficulty in comprehending questions or expressing herself and she answered all questions without any unnecessary digression. She presented as tired and depressed. While she was somewhat reserved at the beginning of the evaluation[,] she was able to laugh by the end of the examination. She showed no signs of agitation, irritability or belligerence. She also showed no signs of elation or euphoria and her mood was congruent with the topic of conversation.
>
> Moreover, she was calm and demonstrated no signs of panic or fear of her surroundings. Nor did she exhibit over signs of anxiety, such as trembling, shaking, or stammering. She was alert and focused during the session and showed no lapses of attention, confusion, or disorientation. Her thinking was organized, and her

associations were tight, and her thinking was lucid and logical. Evaluation of [Plaintiff's] sensorium and cognitive functioning found no difficulties with long[-]term memory. She was oriented to person, place, time, and purpose of the evaluation. She was able to recall her Social Security number and birth date and also able to recall two of a list of three items after a five[-]minute delay. She was also able to spell "WORLD" in reverse. Was unable to count from 1 to 40 by 3s, or from 0 to 39 by 3s, an easier task. She also could not subtract by 7s from 100, or by 3s from 20. She was able to count down from 20 to 0 with accuracy. She was able to add 5+7, 13+14, and 15+18. She was able to list the months of the year in reverse order, up to June, and then lost her concentration. Consulting psychologist Dr. McIntire found [Plaintiff] appeared to be functioning intellectually within the low average range and concluded she would need no help in managing funds if benefits were granted. [Plaintiff's] functional capacity has undoubtedly been impacted by her depression. However, the record, again, does not support the extent of [Plaintiff's] subjective complaints regarding her limitations.

Perhaps most importantly, despite her allegations and testimony regarding severe and disabling mental health symptoms problems, [Plaintiff] has not sought or received treatment from a mental health specialist at any time relevant to this decision. Rather, all treatment appears to have consisted solely of psychotropic medications Duloxetine, Trazodone and Amitriptyline prescribed by her primary care physicians. While [Plaintiff] was advised to establish treatment with a psychiatrist, the record is absent evidence [Plaintiff] followed through on such recommendation. In fact, one of [Plaintiff's] doctors specifically noted he had asked [Plaintiff] to seek psychiatric management for her depression and anxiety and that she understood that they would have a negative effect on her pain and therefore adequate treatment would help her overall pain management as well.

Regarding [Plaintiff's] medications, the medical evidence reveals that these medications have been relatively effective in controlling [Plaintiff's] symptoms as evidenced by her specific denial of psychological problems at times. Moreover, treating sources have failed to appreciate any psychological abnormalities on several occasions, finding her mood and affect appropriate. For instance, while [Plaintiff] reported depressed mood, difficulty concentrating, difficulty staying asleep, diminished interest or pleasure and fatigue on September 29, 2020, her doctor noted her symptoms were controlled. Her Amitriptyline was continued without any change and her doctor advised her to return in six months or sooner if she had any problems or if her condition worsened. [Plaintiff] denied any acute mood changes on January 26, 2021. She was pleasant and friendly. She was oriented to person, place and time and her concentration and attention were normal on February 17, 2021. Her doctor noted her Duloxetine would be slowly titrated up to 60 mg daily to help with her diffuse pain/depression on April 7, 2021. She specifically denied anxiety, depression, impaired cognitive function, insomnia, memory loss, mood changes, panic attacks and suicidal ideation on April 8, 2021. [Plaintiff] was oriented to time, place, person and situation and her memory was

> normal during an April 30, 2021 appointment. Moreover, her mood and affect were appropriate, and her behavior was noted as appropriate for her age. Her mood and affect were appropriate again on May 5, 2021. [Plaintiff] presented as anxious with inappropriate and irritable affect and poor insight and judgment on July 20, 2021. While she was crying and in moderate distress, she was consolable. She related that every medication she had tried for her depression/anxiety had not ever worked for her and that she often discontinued her medication on her own without consulting her provider first. While her doctor noted [Plaintiff] had failed multiple anxiety and depression medications and had achieved minimal symptom control on September 22, 2021, he also noted [Plaintiff] was oriented to time, place, person and situation and presented with appropriate mood and affect, which suggested some symptom control.

(R. at 25-27 (internal citations omitted).)

### III. ADMINISTRATIVE DECISION

On December 10, 2021, the ALJ issued her decision. (R. at 12-36.) The ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2023. (R. at 17.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in substantial gainful activity since September 11, 2020, the alleged onset date. (*Id.*)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

  1. Is the claimant engaged in substantial gainful activity?
  2. Does the claimant suffer from one or more severe impairments?
  3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
  4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
  5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ found that Plaintiff has the following severe impairments: post laminectomy syndrome; spondylosis and disc herniation of the lumbar and cervical spine; bilateral sacroiliitis; generalized arthritis; rheumatoid arthritis; psoriatic arthritis; osteoarthritis of right knee, status post left knee arthroplasty; obesity and depression. (R. at 17-18.) The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that [Plaintiff] has the residual functional capacity to work at the sedentary level, with occasionally lifting 10 pounds and frequently lifting up to 10 pounds; occasionally pushing/pulling with the bilateral lower extremities; standing and/or walking about 2 hours in an 8-hour day; sitting no more than 30 minutes at a time with 1-2 minutes to change positions before returning to sitting for more than 6 hours in an 8-hour day; occasionally climbing ramps and stairs but never ladders, ropes, or scaffolds; occasionally stooping, kneeling and crouching but never crawling; avoiding concentrated exposure to extreme cold, extreme heat, wetness, humidity, and vibration and avoiding all exposure to hazards such as moving mechanical parts, working in high exposed places in the workplace and no commercial driving. Additionally, [Plaintiff] will need the use of a cane for ambulation alone. Mentally, [Plaintiff] can perform simple and routine multi-step tasks that do not require fast production rate pace or strict production quotas.

(R. at 21.) At step four of the sequential process, the ALJ determined that Plaintiff is unable to perform her past relevant work as a real estate agent, receptionist, or a data entry clerk. (R. at 29.) Relying on the VE's testimony, the ALJ concluded at step five that Plaintiff can perform other jobs that exist in significant numbers in the national economy, such as an address clerk, document preparer, or a credit card interviewer. (R. at 30.) She therefore concluded that Plaintiff has not been disabled since September 11, 2020. (R. at 31.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices [Plaintiff] on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V. ANALYSIS

Plaintiff submits two assignments of error: first, that the ALJ erroneously failed to include the need of a cane for both ambulation *and* balance in Plaintiff's RFC, and second, that the ALJ failed to consider the appropriate Listings at step three. (ECF No. 9 at PAGEID ## 964-980.) As discussed below, the Court finds Plaintiff's first assignment of error to be well taken. This finding obviates the need for in-depth analysis of the remaining issue. Thus, the Court need not, and does not, resolve the alternative basis that Plaintiff asserts support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's other arguments if appropriate.

In her first assignment of error, Plaintiff argues that "it is unclear from the record how the ALJ determined that Plaintiff could engage in substantial gainful activity on a full-time and sustained basis." (ECF No. 9 at PAGEID ## 964-965.) Specifically, Plaintiff focuses on the ALJ's restriction that Plaintiff "will need the use of a cane for ambulation alone," arguing that "the evidence in this matter includes symptoms requiring a cane for both ambulation *and* balance." (*Id.* at PAGEID # 968 (emphasis added).) Plaintiff submits that she properly submitted sufficient medical documentation regarding the need for either a cane or walker, and while the ALJ agreed that a cane was necessary for ambulation the ALJ failed to explain why a cane was not necessary for balance as well. (*Id.* at PAGEID # 969.) Such error is not harmless, Plaintiff suggests, because the VE testified that if a cane was needed for both balance and ambulation, "that it would be work preclusive." (*Id.*)

In response, the Commissioner argues that "the ALJ acted reasonably to the extent she did not include the need for a cane to balance," and submits that "Plaintiff has not shown that she needed a cane to balance occasionally." (ECF No. 11 at PAGEID # 993.) The Commissioner also points to various pieces of evidence throughout the record which arguably support the ALJ's

11

decision not to include a limitation to a cane for balancing in the RFC, and concludes that the ALJ's RFC is therefore supported by substantial evidence. (*Id.* at PAGEID ## 991-993.) In her Reply brief, Plaintiff disagrees and submits that "[t]he record . . . clearly established that Plaintiff needed to use a cane for balance and on occasion, a walker." (ECF No. 12 at PAGEID # 998.) Plaintiff concludes that "[s]ince the documentary evidence and testimony demonstrated Plaintiff's reliance on a cane for both balance and ambulation, the RFC was in error necessitating a remand of this matter." (*Id.*)

Plaintiff's arguments are well taken, as the Court agrees that it is unclear how the ALJ reached her conclusions in determining Plaintiff's RFC. It is well settled that an ALJ's decision "must say enough 'to allow the appellate court to trace the path of [the ALJ's] reasoning,'" but the Court is unable to trace the ALJ's reasoning in this instance. *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). Indeed, the ALJ only explains her reasoning for Plaintiff's cane limitation in one sentence, stating that Plaintiff "will need the use of a cane for ambulation alone in light of more recent evidence of her moderate osteoarthritis in the right knee and upcoming elective total right knee replacement." (R. at 27.) While the Court is satisfied with the ALJ's explanation for why Plaintiff needs a cane for ambulation, there is nothing in the ALJ's decision to signal, let alone explain, how or why the ALJ concluded that Plaintiff does not also need a cane for balance. To this end, the implications of restricting Plaintiff to a cane only for ambulation is noteworthy. Plaintiff's counsel directly addressed the issue with the VE during the November 1, 2021 administrative hearing:

> Q: If we were to add that the hypothetical individual would need the cane for balance as well as ambulation, would that impact the availability of the jobs you identified in the file?

12

  A:  Yes. Use of a cane at the sedentary level for both balance and ambulation is work preclusive.

(R. at 72.) This makes the ALJ determination regarding whether Plaintiff needs a cane to balance so significant.

  The Commissioner argues that notwithstanding the ALJ's silence on this precise issue, the ALJ's decision is supported by substantial evidence throughout the record. Yet, the Court cannot agree. While the Commissioner has identified certain records which arguably suggest that Plaintiff did not need a cane for balance, Plaintiff has not surprisingly identified other records which arguably support the opposite conclusion. (*Compare* ECF No. 11 at PAGEID # 993 (identifying records) *with* ECF No. 12 at PAGEID # 998 ("The record . . . established that Plaintiff needed to use a cane for balance and on occasion, a walker") (citing R. at 60-61, 428-429).) These competing interpretations of the record are not instructive, however, especially where (as here) the ALJ did not discuss what the record shows, or does not show, regarding Plaintiff's balance.

  Indeed, the ALJ's seventeen (17) page decision only mentions Plaintiff's balance twice, each time only in passing. First, the ALJ mentions that Plaintiff's balance was "normal" during a September 29, 2020 medical examination. (R. at 24.) Then, the ALJ notes that the State Agency examiners opined that Plaintiff should be limited to a work environment with only occasional balance. (R. at 27.) But these observations are neither substantive nor conclusive, especially given the ALJ's subsequent conclusions that (i) Plaintiff's impairments "are more limiting than what was concluded by the state examiners" and (ii) Plaintiff's need for a cane for ambulation stems from "more recent evidence . . . and [her] upcoming elective total right knee replacement," not any of the medical records from 2020. (*Id.*) Accordingly, the Court views the

Commissioner's arguments to this end as nothing more than unpersuasive *post hoc* rationalizations. *Miller v. Berryhill*, No. 3:16-CV-00094, 2017 WL 1021313, at *8 (S.D. Ohio Mar. 16, 2017) ("[T]his Court shall not 'accept *post hoc* rationalizations for agency action in lieu of [accurate] reasons and findings enunciated by the Board.'") (quoting *Keeton v. Comm'r of Soc. Sec.*, 583 Fed.Appx. 515, 524 (6th Cir. 2014) (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991)); citing *Simpson v. Comm'r of Soc. Sec.*, 344 Fed.Appx. 181, 192 (6th Cir. 2009) (same)).

While the ALJ suggests that "additional medical evidence" and "persuasive testimony at [Plaintiff's] hearing" justify the restriction of a cane for ambulation, the ALJ never discussed what such evidence suggests (or does not suggest) regarding whether Plaintiff also needs a cane for balance. (*Id.*) Rather, the ALJ merely concluded that Plaintiff needs a cane for ambulation while remaining silent on why a cane is not also needed for balance. (*Id.*) As the VE confirmed, this error cannot be harmless, as limiting Plaintiff to a cane for ambulation and balance would be work preclusive. *Stacey*, 451 F. App'x at 520 ("[A]n error is harmless only if remanding the matter to the agency 'would be an idle and useless formality' because 'there is [no] reason to believe that [it] might lead to a different result.'") (quoting *Kobetic v. Comm'r of Soc. Sec.,* 114 Fed.Appx. 171, 173 (6th Cir. 2004)).

Accordingly, because the Court cannot trace the ALJ's path of reasoning or discern why the ALJ only limited Plaintiff to a cane for ambulation, remand is therefore required. *Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-99, 2021 WL 5177818, at *3 (S.D. Ohio Nov. 8, 2021) ("[B]y failing to explain why certain limitations were not incorporated into the RFC, an ALJ prevents the reviewing court from conducting a meaningful review to determine whether substantial evidence supports his decision."); *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-CV-18,

2018 WL 6257432, at *5 (S.D. Ohio Nov. 30, 2018), *report and recommendation adopted*, No. 2:18-CV-018, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019) ("[T]he ALJ's failure to provide such an explanation requires remand because it prevents this Court from conducting meaningful review to determine whether substantial evidence supports his decision."); *see also Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) ("Because the ALJ did not provide an analysis that is sufficiently specific, [Plaintiff's] argument that the ALJ failed to properly articulate the RFC calculation is well-taken. The Court is unable to trace the path of the ALJ's reasoning."); *Commodore v. Astrue*, No. 10–295, 2011 WL 4856162, at *4, 6 (E.D. Ky. Oct. 13, 2011) (remanding action "with instructions to provide a more thorough written analysis," where the ALJ failed to articulate the reasons for his RFC findings such that the Court could not "conduct a meaningful review of whether substantial evidence supports the ALJ's decision").

## VI.   CONCLUSION

Based on the foregoing, Plaintiff's Statement of Errors (ECF No. 9) is **GRANTED.** The decision of the Commissioner is therefore **REVERSED** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in this case pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date: November 8, 2022                      /s/ *Elizabeth A. Preston Deavers*
                                            ELIZABETH A. PRESTON DEAVERS
                                            UNITED STATES MAGISTRATE JUDGE